IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL CASE NO: 7:26-cv-190

| | | |
|---|---|---|
| FERNANDO JAVIER RODRIGUEZ LUNA, *on behalf of himself and all other similarly situated persons,*<br><br>Plaintiff,<br><br>v.<br><br>ALVINO AVILEZ CASTANEDA, d/b/a ALVINO AVILEZ CONTRACTOR, AVILEZ & SONS HARVESTING, LLC, and JACKSON'S FARMING COMPANY OF AUTRYVILLE,<br><br>Defendants. | ) | FIRST AMENDED COMPLAINT |

## PRELIMINARY STATEMENT

1. Plaintiff Fernando Javier Rodríguez Luna ("Plaintiff Rodríguez Luna"), files this First Amended Complaint against Alvino Avilez Casertano ("Avilez") and Avilez & Sons Harvesting, LLC (referred to with Avilez as "Avilez Defendants"), and Jackson's Farming Company of Autryville ("JFC" or "Jackson Farming Company") (collectively referred to "Defendants"), individually and on behalf of other similarly situated employees of Defendants.

2. Defendants induced Plaintiff and other workers to leave their homes, pay recruitment fees, and travel to the U.S. at their own expense with false promises of work that complied with the requirements of the H-2A program. Plaintiff and other workers went into debt for these expenses, with the expectation of a job that would provide them with financial security.

3. Once workers arrived in the U.S., the Avilez Defendants confiscated workers' passports and Social Security cards, telling the workers it was to prevent them from leaving.

4. Furthermore, the work they encountered was not what they were promised. Workers were paid below the promised wage rate, were forced to pay kickbacks and other fees, and worked long hours without reliable access to water or bathrooms. In their employer-provided housing, workers encountered overcrowding, lack of adequate furniture and appliances, and constant surveillance.

5. The combination of false promises, illegal recruitment fees (and the workers' corresponding debt), passport confiscation, threats, and appalling living and working conditions meant that workers were coerced to continue working for Defendants.

6. Plaintiff brings this action to assert claims against all Defendants under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581, *et seq.* (TVPRA), the North Carolina Human Trafficking Law, N.C. Gen. Stat. § 14-43.18, *et seq.,* the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, the North Carolina Wage and Hour Act (NCWHA), N.C. Gen. Stat. § 95-25.1, *et seq.*, and North Carolina common law. Plaintiff also brings an individual claim under the North Carolina Retaliatory Employment Discrimination Act (REDA), N.C. Gen. Stat. § 95-240, *et seq* and for wrongful discharge in violation of North Carolina public policy.

7. Plaintiff seeks back wages, liquidated and punitive damages, contract damages, compensatory damages, declaratory and injunctive relief, pre- and post-judgment interest, costs of the action, attorneys' fees, and other appropriate relief to make himself and other similarly situated employees whole for damages suffered due to the Defendants' violations of law.

## JURISDICTION

8. This Court has jurisdiction over this matter pursuant to:

   a. 28 U.S.C. § 1331 (Federal Question);

b. 28 U.S.C. § 1337 (Interstate Commerce);

c. 18 U.S.C. § 1595(a) (TVPRA);

d. 29 U.S.C. § 216(b) (FLSA); and

e. 28 U.S.C. § 1367 (Supplemental Jurisdiction).

9. This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiff's TVPRA and FLSA claims that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

10. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

11. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) because, at all times relevant to this Complaint, regular and substantial business activities of all Defendants occurred in Sampson County and surrounding counties in North Carolina, and a substantial part of the events or omissions giving rise to the Plaintiff's claims were committed within the jurisdiction of the Eastern District of North Carolina.

## PARTIES

### Named Plaintiff

12. Plaintiff Fernando Javier Rodríguez Luna is a citizen of Mexico who was admitted to the U.S. on a temporary basis with a visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) (the "H-2A Program") to perform agricultural labor for Defendants in 2024 and 2025.

13. Defendants employed Plaintiff to perform agricultural and related work for them in or around Duplin and Sampson counties, North Carolina, within the meaning of 29 U.S.C. §§

203(d) and 203(g), N.C. Gen. Stat. §§ 95-25.2(3) and 95-25.2(5), and 20 C.F.R. §§ 655.103(b) and 655.1300(c) and North Carolina common law.

14. At all times relevant to this Complaint, Plaintiff was engaged in commerce or in the production of goods for commerce, or was employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A).

15. Plaintiff and most, if not all, members of the putative FLSA Collectives and putative Classes fluently speak and/or read languages other than English, and do not fluently speak or read English.

Defendants

16. Defendant Alvino Avilez Castaneda ("Avilez") is a natural person who at times has done business as "Alvino Avilez Contractor."

17. Alvino Avilez Contractor's business address is 174 Cousin Fannie Road, Faison, NC 28341.

18. Alvino Avilez Castaneda's home address is 174 Cousin Fannie Road, Faison, NC 28341.

19. At all times relevant to this action, Defendant Avilez operated and/or operates as a farm labor contractor, which means he contracts with agricultural entities to supply them with labor. Defendant Avilez does not operate his own farm in North Carolina.

20. Upon information and belief, at all times relevant to this action, Defendant Avilez exercised, and/or exercises, the authority to direct, control, and/or supervise the work of the named Plaintiff and members of the putative FLSA Collectives and putative Classes.

21. At all times relevant to this Complaint, Defendant Avilez was an employer of H-2A workers, including the Plaintiff and the members of the putative FLSA Collectives and the putative Classes, as defined in the H-2A regulations, 20 C.F.R. § 655.103(b); the FLSA, 29 U.S.C. § 203(d); the NCWHA, N.C. Gen. Stat. § 95-25.2(5), and North Carolina common law.

22. At all times relevant to this Complaint, Defendant Avilez d/b/a Alvino Avilez Contractor was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

23. At all times relevant to this complaint, Defendant Avilez was a person under the REDA, N.C. Gen. Stat. § 95-240(1).

24. At all times relevant to this Complaint, Defendant Avilez d/b/a Alvino Avilez Contractor had an annual gross volume of sales made or business done of not less than $500,000 exclusive of excise taxes at the retail level that were separately stated.

25. Defendant Avilez & Sons Harvesting, LLC ("Avilez & Sons") is a limited liability company organized under the laws of the state of North Carolina in March of 2025. Alvino Avilez Castaneda is the sole Member/Organizer of Avilez & Sons. The street address for Avilez & Sons is 174 Cousin Fannie Rd., Faison, NC 28341.

26. Upon information and belief, Avilez & Sons is a continuation of Alvino Avilez Contractor.

27. GM Multi Service Express LLC, 2066 W. NC 403 Hwy, Faison, NC 28341-8526 was the registered agent for Avilez & Sons at the time this action was initiated. As of at least July 15, 2026, Alvino Avilez Castaneda, 174 Cousin Fannie Rd., Faison, NC 28341 is the registered agent for Avilez & Sons.

28. Starting in 2025, Defendant Avilez & Sons was an employer of H-2A workers, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b); the FLSA, 29 U.S.C. § 203(d); and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

29. Defendant Avilez & Sons was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

30. Upon information and belief, in 2025, Defendant Avilez & Sons had an annual gross volume of sales made or business done of not less than $500,000 exclusive of excise taxes at the retail level that were separately stated.

31. During each calendar year falling in the four-year time period immediately preceding the date on which this action was filed, one or more employees of the Avilez Defendants, including Plaintiff, handled goods or equipment that had moved in interstate commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

32. Upon information and belief, at all times relevant to this Complaint, Omar Avilez was an agent acting on behalf of the Avilez Defendants.

33. Upon information and belief, Omar Avilez acted at all relevant times with authorization from and at the behest of the Avilez Defendants.

34. Upon information and belief, at all times relevant to this Complaint, Victor Estrada was an agent acting on behalf of the Avilez Defendants.

35. Upon information and belief, Victor Estrada acted at all relevant times with authorization from and at the behest of the Avilez Defendants.

36. The Avilez Defendants operated through additional agents who, upon information and belief, acted with authorization and at the behest of the Avilez Defendants.

37. Defendant Jackson's Farming Company of Autryville ("JFC" or "Jackson Farming Company") is a corporation first organized under the laws of the state of North Carolina in 1981 and located at 2905 Ernest Williams Road, Autryville, NC 28318.

38. William Brent Jackson, who goes by Brent Jackson, is the registered agent for Defendant JFC and the Chairman of JFC's Board.

39. William Rodney Jackson ("Jackson" or "Rodney Jackson") is the President of JFC. Since 2010, Rodney Jackson has been managing all of JFC's farm operations. He became President and CEO of JFC in 2017.

40. At all times relevant to this Complaint, Defendant JFC was and is an employer of H-2A workers, including the Plaintiff and the members of the putative FLSA Collectives and the putative Classes, as defined by the H-2A regulations, 20 C.F.R. § 655.103(b); the FLSA, 29 U.S.C. § 203(d); the NCWHA, N.C. Gen. Stat. § 95-25.2(5); and North Carolina common law.

41. Upon information and belief, at all times relevant to this action, Defendant JFC exercised, and/or exercises, the authority to direct, control, and/or supervise the work of the named Plaintiff and members of the putative Collectives and Classes.

42. At all times relevant to this complaint, Defendant JFC was a person under the REDA, N.C. Gen. Stat. § 95-240(1).

43. At all times relevant to this Complaint, Defendant JFC was an enterprise "engaged in commerce or in the production of goods for commerce" within the scope and meaning of the FLSA, 29 U.S.C. § 203(s)(1)(A).

44. Upon information and belief, during each calendar year falling in the four-year period immediately preceding the date on which this action was filed, Defendant JFC had an annual

gross volume of sales made or business done of not less than $500,000 exclusive of excise taxes at the retail level that were separately stated.

45. During each calendar year falling in the four-year time period immediately preceding the date on which this action was filed, one or more employees of JFC, including Plaintiff, handled goods or equipment that had moved in interstate commerce within the meaning of 29 U.S.C. § 203(s)(1)(A).

46. Defendants jointly employed Plaintiff within the meaning of 29 C.F.R. § 791.2.

## FACTUAL ALLEGATIONS

### The H-2A Program

47. The H-2A visa program allows agricultural employers in the United States to recruit foreign workers to perform agricultural labor of a temporary nature if the U.S. Department of Labor ("USDOL") certifies that (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly situated U.S. workers. Foreign workers admitted under this program are commonly known as "H-2A workers." 8 U.S.C. § 1188(a)(15)(H)(ii)(a); 20 C.F.R. §§ 653.500, 655.135(c), 655.103.

48. The H-2A program is a vestige of the mid-twentieth century "bracero" program, which brought millions of Mexican workers to the U.S. for seasonal work.

49. Temporary agricultural workers recruited under the H-2A program suffer from many of the same abuses as the bracero program. Migrants leave dire conditions in their home countries only to be shortchanged and overworked by employers who take advantage of the limited protections available to H-2A workers.

50. The H-2A visa only authorizes work permission for a specific employer; it is not portable. This means that a worker's continued legal status is tied to their continued employment with the petitioning employer, disincentivizing workers from complaining about labor violations. The fear of retaliatory termination leaves workers particularly vulnerable to abuse and trafficking.

51. The H-2A regulations set the minimum benefits, wages, and working conditions that the employer must offer to avoid an adverse effect upon U.S. workers. 20 C.F.R. §§ 655.0(a)(2), 655.122, 655.135.

52. In order to receive certification to employ H-2A workers, an agricultural employer must first submit a clearance order, also known as a job order (Form ETA-790/790A), to the local State Workforce Agency (in this case, the North Carolina Department of Commerce, Division of Employment Security) to be used for recruiting U.S. workers. 20 C.F.R. §§ 655.121(e); 655.143.

53. The job order must contain all the material terms and conditions of employment being offered by that agricultural employer and must comply with applicable regulations for the recruitment of both U.S. and H-2A workers. 20 C.F.R. §§ 655.121(a)(4); 655.122; 653.501.

54. The next step is for an agricultural employer to submit an Application for Temporary Employment Certification (Form ETA 9142A) to USDOL's National Processing Center. Once USDOL certifies the employer's application, they are authorized to employ H-2A workers. 20 C.F.R. §§ 655.121(a); 655.130.

55. Employers seeking to employ H-2A workers must agree to abide by all the requirements contained in the H-2A regulations. 20 CFR Part 655, Subpart B.

56. One such requirement is that H-2A employers must pay H-2A workers at least the Adverse Effect Wage Rate ("AEWR"), a minimum hourly rate for work performed, for all hours worked. 20 C.F.R. §§ 655.120(a)(1); 655.122(l). If the worker is paid on a piece rate basis and the

piece rate earnings at the end of the pay period are less than what the worker should have been paid at the AEWR for all hours worked, the workers' pay must be supplemented to bring earnings up to the AEWR. 20 C.F.R. § 655.122(l)(2).

57. The AEWR for North Carolina in 2024 was $15.81 per hour. 88 F.R. 86677 (December 14, 2023). The AEWR for North Carolina in 2025 was $16.16 per hour. 89 F.R. 101628 (December 16, 2024). The AEWR for Skill Level I in North Carolina for 2026 is $12.78. 90 F.R. 47914 (October 2, 2025).[1]

58. The H-2A regulations also require employers to disclose in the job offer all deductions that the employer will make from their paychecks unless they are required by law. 20 C.F.R. § 655.122(p)(1). Such deductions may not result in a profit to the employer or any affiliated person and may not be primarily for the benefit or convenience of the employer. 20 C.F.R. § 655.122(p)(2).

59. Undisclosed or unauthorized deductions or kickbacks made directly or indirectly to the employer may not reduce an H-2A worker's pay below the AEWR. 20 C.F.R. § 655.122(p)(2).

60. Employers must provide their H-2A employees with a written work contract containing all of the job offer requirements in 20 C.F.R. § 655.122, including those requirements discussed in paragraphs 56-58. If the employer fails to provide a written contract, the required terms of the job order and application for temporary employment certification are treated as the terms of a contract between the employer and H-2A worker. 20 C.F.R. § 655.103(b).

61. H-2A employers may not hold or confiscate a worker's passport unless the worker requests this in writing. 20 C.F.R. § 655.135(o).

---

[1] This wage rate is part of an Interim Final Rule that is being challenged. *See United Farm Workers v. United States Department of Labor*, 1:25-cv-01614 (E.D. Cal.)

62. Employers and their agents may not seek or receive payment of a recruitment fee. 20 C.F.R. § 655.135(j).

Defendants' H-2A Contracts

63. Defendant Avilez applied for and received temporary labor certification for 60 H-2A workers to work in North Carolina for Rodney Jackson from April 20, 2024, to December 15, 2024 in a variety of crops, including melons, sweet potatoes, and broccoli.

64. The job order approved for Defendant Avilez for this period ("2024 Contract") included the following terms:

a. Employer will pay $15.81 per hour for hourly work;

b. Employer will pay $0.50 per 5/8-bushel bucket of sweet potatoes but will provide make-up pay if the piece rate pay results in average hourly earnings below $15.81;

c. Employer will provide or pay for outbound transportation, or allow the employees to select their outbound transportation and will reimburse them at no less than the most economical and reasonable common carrier transportation charges;

d. Employer will contractually forbid any foreign labor contractor or recruiter with whom the employer engages to seek or receive recruitment fees from prospective employees, except as provided for in 8 C.F.R. § 214.2(h(5)(xi)(A);

e. Employer will furnish employees on or before each payday a written statement with (1) the worker's total earnings for the pay period; (2) hourly rate and/or piece rate of pay; (3) hours of work offered; (4) hours actually

worked; (5) itemization of deductions; (6) pieces produced, if payment by a piece rate; (7) dates of the pay period; (8) employer's name, address, and Federal Employer Identification Number (FEIN);

f. Employer will reimburse the worker for transportation and subsistence expenses if the worker completes 50 percent of the work contract period; and

g. Employer will comply with all applicable federal, state, and local laws and regulations, including the prohibition on confiscating workers' passports, visas, or other immigration documents.

65. The Avilez Defendants provided Plaintiff and, upon information and belief, his similarly situated coworkers a copy of the job order each season, which constituted a contract between them. The 2024 Contract was provided to Plaintiff and his similarly situated coworkers in English only, even though they were not fluent or literate in English.

66. Defendant Avilez applied for and received temporary labor certification for 60 H-2A workers to work in North Carolina for Rodney Jackson from April 20, 2025, to December 15, 2025 in a variety of crops, including melons, sweet potatoes, and broccoli.

67. The job order approved for Defendant Avilez for this period ("2025 Contract") included the following terms:

a. Employer will pay $16.16 per hour for hourly work;

b. Employer will pay $0.50 per 5/8-bushel bucket of sweet potatoes but will provide make-up pay if the piece rate pay results in average hourly earnings below $16.16;

c. Employer will provide or pay for outbound transportation, or allow the employees to select their outbound transportation and will reimburse them at no less than the most economical and reasonable common carrier transportation charges;

d. Employer will contractually forbid any foreign labor contractor or recruiter with whom the employer engages to seek or receive recruitment fees from prospective employees, except as provided for in 8 C.F.R. § 214.2(h)(5)(xi)(A);

e. Employer will furnish employees on or before each payday a written statement with (1) the worker's total earnings for the pay period; (2) hourly rate and/or piece rate of pay; (3) hours of work offered; (4) hours actually worked; (5) itemization of deductions; (6) pieces produced, if payment by a piece rate; (7) dates of the pay period; (8) employer's name, address, and FEIN;

f. Employer will reimburse the worker for transportation and subsistence expenses if the worker completes 50 percent of the work contract period; and

g. Employer will comply with all applicable federal, state and local laws and regulations, including the prohibition on confiscating workers' passports, visas, or other immigration documents.

68. The 2025 Contract was provided to Plaintiff and his similarly situated coworkers in English only, even though they were not fluent or literate in English.

69. The 2024 and 2025 Contracts were signed by Alvino Avilez Castaneda.

70. Upon information and belief, Defendant Avilez knowingly made false representations on the 2024 and 2025 applications and accompanying job orders submitted to USDOL for approval, including regarding the wage rates that would be paid to workers; reimbursement of transportation and subsistence costs; not charging recruitment fees; and compliance with applicable federal, state, and local laws and regulations including the prohibition on confiscating workers' passports, visas, or other immigration documents.

71. Defendant Avilez also applied for and received temporary labor certification for H-2A workers to work in North Carolina for Rodney Jackson and/or JFC in 2019, 2020, 2021, 2022 and 2023.

72. Since at least 2021, Defendant JFC also applied for and received temporary labor certification to directly employ H-2A workers in addition to the H-2A workers supplied by Defendant Avilez.

73. Defendant JFC applied for and received temporary labor certification for 91 H-2A workers to work in North Carolina from February 15, 2024 to December 15, 2024, in a variety of crops, including melons, sweet potato, and broccoli.

74. Defendant JFC applied for and received temporary labor certification for 98 H-2A workers to work in North Carolina in 2025 on three separate contracts: 34 workers from February 15, 2025 to December 14, 2025 (harvest broccoli and sweet potatoes, other crop activities); 31 workers from May 15, 2025 to December 15, 2025 (harvest broccoli and sweet potatoes, other crop activities); and 33 workers from May 31, 2025 to December 14, 2025 (harvest and pack broccoli, harvest sweet potatoes, other crop activities).

75. Defendant Avilez engaged Andrew Jackson as his visa processing agent for his 2021 through 2025 applications for temporary H-2A employment. Defendant JFC also engaged

Andrew Jackson as its visa processing agent for its 2025 applications for temporary H-2A employment.

Recruitment and Travel

76. Upon information and belief, Defendant JFC contracted with the Avilez Defendants to recruit workers abroad and apply for H-2A visas for them to work for JFC in North Carolina during the 2024 and 2025 agricultural seasons.

77. The Avilez Defendants, by and through their agent(s) in Mexico, recruited Plaintiff and others to work in North Carolina during the 2024 and 2025 agricultural seasons on H-2A visas.

78. The Avilez Defendants, through their agent Omar Avilez, required Plaintiff to pay a recruitment fee of $75,000 Mexican pesos (approximately $4,514 USD) in order to be placed on the list of potential workers in 2024.

79. Upon information and belief, the Avilez Defendants require all persons recruited to work for them for the first time to pay a recruitment fee as a condition of employment.

80. Relying on the Avilez Defendants' promises, Plaintiff obtained loans in his hometown to pay for the recruitment fee and the costs associated with obtaining his visa and traveling to North Carolina. He obtained one loan through a Mexican bank, and the loan money was paid directly to Avilez's agent. Plaintiff obtained a second loan from a local loan shark.

81. The loans Plaintiff obtained represented a significant amount of money for him. In 2024, those loans totaled approximately 140,000 Mexican pesos (approximately $8,446 USD), and in 2025 they totaled approximately $90,000 Mexican pesos (approximately $4,406 USD). By comparison, Plaintiff's weekly earnings in Mexico before coming to the United States were approximately $2,500 Mexican pesos (approximately $151 USD).

82. Plaintiff began repaying his debts immediately upon receiving his first paycheck.

83. Even if Plaintiff put all of his wages earned in the U.S. towards repaying his debt and was not charged any interest on repaying the loans, it would take him close to two years to completely pay off this debt. Plaintiff believed that without his employment in the U.S., it would be impossible for him to make these payments.

84. Upon information and belief, most or all persons that the Avilez Defendants recruited for the first time in the 2024 and 2025 agricultural seasons were charged recruitment fees.

85. Upon information and belief, most or all persons that the Avilez Defendants recruited in the 2024 and 2025 agricultural seasons had to obtain a loan or loans to pay the costs associated with recruitment, visas, and/or travel to the United States.

86. The Avilez Defendants' agent Omar Avilez, brother of Defendant Avilez, instructed workers, including Plaintiff, how to apply for and get an H-2A visa; when to depart from their hometowns to travel to Monterrey, Mexico to obtain the visa; when to report to the U.S. Consulate for the visa interview; how to conduct themselves in the interview; and when and how to depart for the job in North Carolina.

87. At the direction of the Avilez Defendants' agents in Mexico, Plaintiff and other similarly situated workers traveled at their own expense from their villages to the U.S. Consulate in Monterrey, where they waited for their visas to be issued.

88. Plaintiff and other similarly situated workers paid the fees associated with their H-2A visas.

89. Plaintiff and other similarly situated workers each paid for the costs of lodging for multiple nights in the hotel in Monterrey near the Consulate where the Avilez Defendants' agent instructed them to stay.

90. Plaintiff traveled with other employees of the Avilez Defendants from Monterrey, Mexico, to the U.S./Mexico border in buses arranged by the Avilez Defendants. Plaintiff and the other employees paid Omar Avilez for the cost of the bus.

91. Employees of the Avilez Defendants then transported Plaintiff and his similarly situated coworkers from the U.S./Mexico border to North Carolina.

92. Plaintiff and his coworkers each paid $490 to Omar Avilez, which Omar Avilez told them included a $200 fee for crossing the border. The actual border crossing fee was just $6.

93. Plaintiff and similarly situated workers paid for their own meals during their travel from Monterrey to North Carolina.

94. In 2024, the Avilez Defendants promised Plaintiff that if he returned to the U.S. for the following season, he would receive better working conditions. Plaintiff returned for the 2025 season based on the promise of better working conditions, as well as his need to pay off the debt he incurred to pay recruitment fees and other expenses.

95. In 2025, Plaintiff was not required to pay a recruitment fee because he had paid at the start of his first season. Upon information and belief, other H-2A workers who were working for the Avilez Defendants for the first time in 2025 were required to pay recruitment fees.

96. Plaintiff and his similarly situated coworkers paid all of the same other visa, travel, lodging, and subsistence fees in 2025 that they paid in 2024. In 2025 they additionally paid for travel from Monterrey back to their hometowns when their visas were not ready in Monterrey.

97. Defendants never reimbursed Plaintiff or similarly situated workers for any of the expenses described in paragraphs 78–79, 87–90, 92–93, and 95–96.

98. Because of this failure to reimburse, upon information and belief, Plaintiff's earnings in that first workweek were below the minimum wage and below the promised AEWR.

99. Upon information and belief, the earnings of Plaintiff's similarly situated coworkers were also below the minimum wage and below the promised AEWR in their first workweeks.

Employment by JFC

100. Plaintiff and his similarly situated coworkers worked planting and harvesting a variety of Defendant JFC's crops. All of their work, except for a short period in 2025, was performed in fields owned or controlled by JFC.

101. JFC exercised power to direct, control, or supervise the workers employed by the Avilez Defendants ("Avilez crew" or "Avilez workers"). Rodney Jackson and, upon information and belief, Rodney Jackson's brother (another JFC official), were in the fields with the Avilez workers on a regular basis, and they supervised the work of Plaintiff and his similarly situated coworkers. They provided direction to Omar Avilez and Victor Estrada ("Avilez supervisors") regarding the work of the Plaintiff and other similarly situated employees, including specifying the work locations each day. They also spoke to the workers through an interpreter to instruct them on how to perform their work.

102. Avilez workers worked on JFC land and used JFC equipment. JFC also owned the containers that Avilez crew members were required to fill with harvested crops.

103. JFC exercised a high degree of control over the manner in which the Avilez crew performed their work. Rosalino, a JFC employee known to the workers as "El Chaparro," convened daily morning meetings with the Avilez workers and Avilez supervisors at the farm, during which the JFC and Avilez supervisors gave the Avilez workers instructions. At times El Chaparro instructed Avilez workers to stop working because of a problem in the harvesting process. El Chaparro also instructed the Avilez crew workers in great detail on how to harvest

specific crops, including the measurements of the cut and shape for each crop, how to pack the crops into boxes, and how to weigh the crops.

104. Employees of JFC disciplined Avilez crew members and held themselves out as having the authority to fire them. When El Chaparro thought that workers had not performed their harvesting tasks well, he punished them by sending them back to their housing without pay.

105. Some of the H-2A workers employed pursuant to JFC's own H-2A applications ("JFC H-2A crew") also managed the work of the Avilez crew. Members of the JFC H-2A crew directed members of the Avilez crew regarding which crops to harvest in which fields, and what time to start work. JFC H-2A crew members also reprimanded members of the Avilez crew when there were issues with their work.

106. On one occasion, while repacking some watermelons, Plaintiff and a group of his coworkers were supervised only by the JFC H-2A managers.

107. Defendant Avilez told Plaintiff and his coworkers to do everything that JFC employees instructed them to do and follow all of their directions.

108. JFC and the Avilez Defendants have a longstanding business relationship. The Avilez Defendants have recruited, obtained, and provided H-2A workers to JFC since at least 2019. Upon Information and belief, JFC exercises control over the Avilez Defendants in that the Avilez Defendants are dependent on JFC compensating them in order to stay in business. From 2021 to 2024, the Avilez Defendants' only H-2A certification was to supply workers to JFC.

<u>Forced Labor, Trafficking and Document Confiscation</u>

109. As soon as Plaintiff and his similarly situated co-workers arrived at the labor camp in North Carolina each year, agents of the Avilez Defendants confiscated their passports and their H-2A visas, which were contained within the passports.

110. Agents of the Avilez Defendants arrived at the labor camp, knocked at each of the trailers, and collected the workers' passports together in a clear container.

111. Omar Avilez told the workers that they were taking their passports to ensure that they did not leave their employment. Plaintiff (and upon information and belief, his similarly situated coworkers) understood Omar to be speaking with the authority of the Avilez Defendants.

112. The Avilez Defendants also confiscated the Social Security cards of Plaintiff and the other workers. For workers obtaining their Social Security cards for the first time, the Avilez Defendants took their cards as soon as the workers received them. For workers who arrived in North Carolina with Social Security cards, the Avilez Defendants took them upon arrival.

113. JFC supervisor El Chaparro was present during all the meetings held in the field with the Avilez Defendants and the Avilez workers. As such, JFC knew which workers were Avilez workers.

114. El Chaparro was present in 2024 and 2025 when Defendant Avilez discussed confiscating and retaining possession of the Avilez workers' passports.

115. Upon information and belief, other JFC personnel were present in many of the morning meetings on the farm with the Avilez crew alongside El Chaparro.

116. Because the confiscation of the Avilez workers' passports was discussed in the presence of JFC supervisors, JFC knew or should have known that the Avilez workers had had their passports confiscated.

117. During one meeting with Avilez workers and Avilez supervisors, JFC supervisor and agent El Chaparro threatened Plaintiff and his similarly situated coworkers that if they did not like the job, they could return to Mexico or Defendants could have them deported. Plaintiff and

his similarly situated coworkers understood that if they refused to comply with Defendants' demands to continue working, Defendants would have them deported.

118. JFC knew or should have known that El Chaparro threatened that Defendants could have the workers deported if they did not continue to work for them.

119. JFC knew or should have known that the Avilez Defendants had confiscated Plaintiff's and his similarly situated coworkers' passports and visas in order to keep them from quitting.

120. JFC knew or should have known that the Avilez Defendants had confiscated Plaintiff's and his similarly situated coworkers' passports in order to, without lawful authority, maintain or restrict their labor.

121. Defendant Avilez told the Avilez workers they would need to pay $300 to get their passports back.

122. Plaintiff and his similarly situated coworkers were deterred from leaving their employment because they did not have their immigration documents. Without their immigration documents, they knew that they had no way of demonstrating their legal immigration status or showing their H-2A visas. They understood that without their passports, they were at risk of arrest, detention, and deportation by immigration officials at any time.

123. Defendant Avilez also told Plaintiff and his similarly situated coworkers that if they left employment before the end of the contract, he would notify the U.S. Consulate that they had quit; they would face immigration consequences; and they would be banned from the United States and from receiving an H-2A visa in the future.

124. Plaintiff and his similarly situated coworkers understood that if they quit before the end of the contract, they would face immigration consequences, including possible deportation

and visa denial in the future, making them unable to return to the United States. They also believed that they would be unable to obtain another H-2A visa in the future, or a comparable rate of pay to the rate of pay required by the H-2A visa regulations, impacting their ability to repay the debt they had incurred to pay recruitment fees to the Avilez Defendants and their travel expenses to come to the United States.

125. Plaintiff did not have a driver's license or access to a car during his employment with Defendants. Plaintiff and his similarly situated coworkers were not aware of and never saw any public transportation that passed by the housing or by the farm, nor did they know how to call a taxi or car service to the housing or farm.

126. Plaintiff could not pay the $300 fee to recover his passport because he needed to pay off his debt and support his family. Additionally, Plaintiff believed it would be impossible to repay his debt without remaining in his employment in the United States.

127. In 2024, the Avilez Defendants confiscated and held the workers' passports, H-2A visas, and Social Security cards for the entire duration of the season and did not return them until the end of the season. In 2025, the Avilez Defendants confiscated and held the workers' passports and H-2A visas for several months and did not return them until June of 2025.

128. Upon information and belief, the Avilez Defendants returned the workers' passports and visas in June 2025 because of an ongoing USDOL investigation, as they wanted to avoid USDOL detecting that the workers' documents had been confiscated. The Avilez Defendants instructed the workers not to tell the USDOL investigators that their passports had been confiscated.

129. As a result of the passport confiscation, Plaintiff and his similarly situated coworkers feared that they would suffer serious harm if he did not continue working for the Defendants.

<u>Compensation</u>

130. Plaintiff and his similarly situated coworkers had an express agreement that Defendants would pay them wages at the rate required by any applicable federal and/or state law when those wages were due for each hour or part of an hour that Plaintiff and the putative Collectives and Class members performed compensable work under the FLSA and/or the NCWHA for Defendants based on the H-2A job order provided to Plaintiff and his coworkers.

131. In the alternative, Plaintiff and his similarly situated coworkers had a constructive or implied agreement that Defendants would pay them wages at the rate required by any applicable federal and/or state law when those wages were due for each hour or part of an hour that Plaintiff and the putative Collectives and Class members performed compensable work under the FLSA and/or the NCWHA for Defendants based on the assurances Defendants made in their H-2A applications.

132. At times, Defendants paid Plaintiff and his similarly situated coworkers a piece rate. For example, Plaintiff was paid by the bucket for harvesting sweet potatoes and by the case for harvesting broccoli. When harvesting watermelons, groups of ten workers were assigned to fill one truck and were paid by the truck for each truck they filled with watermelons.

133. Defendants did not supplement the wages of Plaintiff and similarly situated coworkers when what they earned on a piece-rate basis was less than the AEWR.

134. Upon information and belief, Defendants did not record the hours worked by Plaintiff and similarly situated workers when they were working by the piece.

135. Defendants paid Plaintiff and similarly situated workers a piece rate for harvesting watermelons, when that piece rate was not disclosed in the contract.

136. At times, Defendant Avilez ordered Plaintiff and his similarly situated coworkers to perform unpaid labor maintaining worker housing. These tasks included cleaning up trees that had fallen during a hurricane, performing landscaping, repairing the bathroom, and fixing leaks in the roof.

137. Defendant Avilez also instructed Plaintiff to install a security system with surveillance cameras at the worker housing. Plaintiff was not paid for this labor.

138. During some workweeks in 2024 and 2025, the Avilez Defendants provided Plaintiff and his similarly situated coworkers with paystubs showing only piece rate pay and that had no record of hours worked.

139. When Plaintiff and similarly situated workers were paid by the hour, for example, for weeding, they were not credited for partial hours of work, which resulted in unpaid work time.

140. In 2024 the paystubs issued to Plaintiff and, upon information and belief, his similarly situated coworkers, at times listed a pay rate of $9.50 per hour.

141. Plaintiff and, upon information and belief, other similarly situated workers, often did not receive the compensation reported on the paystubs. Plaintiff and, upon information and belief, other similarly situated workers, were each typically paid $300 to $400 per week.

142. In 2024, the Avilez Defendants required Plaintiff and his similarly situated coworkers who were in the U.S. for the first time to pay a total of $800 each, which the Avilez Defendants told them was the cost of their Social Security cards. This charge was deducted in two separate payments from the workers' wages.

143. The Social Security Administration does not charge money for the issuance of Social Security cards.

144. Upon information and belief, the Avilez Defendants knew that Social Security cards are available free of charge. Nevertheless, the Avilez Defendants did not disclose to Plaintiff or his coworkers that Social Security cards are available for free.

145. The Avilez Defendants violated 42 U.S.C. § 1320b-10(a)(4) by charging the Plaintiff and his coworkers a fee to obtain their Social Security cards.

146. The Plaintiff did not provide written or verbal authorization for the $800 deduction and, upon information and belief, neither did his similarly situated coworkers.

147. Upon information and belief, during the workweeks when these deductions took place, Defendants did not pay Plaintiff and similarly situated workers at least the minimum wage.

148. During the workweeks when these deductions took place, Defendants paid Plaintiff and similarly situated workers less than the AEWR.

149. At some point in 2025, the Avilez Defendants began using an electronic punch card system. After this, the paystubs provided to Plaintiff and his similarly situated coworkers indicated that they had been paid at least the AEWR based on the hours worked that were reported on their paystub each workweek.

150. However, after the electronic timekeeping system was instituted, the Avilez Defendants required Plaintiff and similarly situated workers to repay them for the difference between what their paystubs showed and what they would have earned if paid purely on a piece rate basis.

151. Plaintiff and his similarly situated coworkers were also required to punch out before traveling to another field to work during the workday and were not paid for their travel time between worksites.

152. Defendants required the workers to wear gloves and boots, which the workers were required to purchase for themselves.

153. Defendants also required the workers to wear face coverings when working in tobacco, which the workers were required to purchase for themselves.

154. In 2024 and 2025, Plaintiff and his similarly situated coworkers paid for their own transportation and subsistence costs to return to Mexico, as well as a $490 fee.

USDOL Investigation

155. The U.S. Department of Labor Wage and Hour Division conducted an investigation into the Avilez Defendants beginning in 2025.

156. Defendant Avilez instructed the workers to lie to the USDOL investigators about the recruitment fee, the lack of reimbursement for expenses, the required repayment of part of their wages to Defendants, and the lack of access to drinking water in the fields.

157. Defendant Avilez, through an agent, told Plaintiff and his coworkers that if USDOL asked them about their situation they should respond that everything is fine.

158. In August 2025, Defendant Avilez also required Plaintiff and his coworkers to sign a document, but to date it May of 2025. Upon information and belief, this document had to do with the USDOL investigation.

159. In anticipation of USDOL investigators visiting JFC's fields, Defendants provided Plaintiff and similarly situated workers with drinking water, disposable cups, and bathrooms in the fields, which were not normally provided.

160. In order to hide the truth of the workers' conditions from the USDOL investigators, the Avilez Defendants returned the workers' passports to them in June 2025 and instructed the workers not to tell investigators that their passports had been confiscated.

Working Conditions

161. Plaintiff and his similarly situated coworkers worked long hours and traveled long distances to the fields. They usually left for work in the very early morning, sometimes as early as 3:30 AM, and returned home late at night, sometimes as late as 11:30 PM.

162. As a result, Plaintiff and his similarly situated coworkers slept as little as three hours a night. They did hard manual labor in the fields while in a permanent state of exhaustion and sleep deprivation without reliable access to drinking water or bathrooms.

163. They worked Monday through Saturday and sometimes Sunday. At times, Plaintiff and his coworkers were not provided any breaks at all during the workday.

164. Most of the time, Defendants did not provide drinking water for workers in the fields. When water was provided, often no disposable cups were provided, so workers had to drink the water directly from a common container.

165. Most of the time, Defendants did not provide an outhouse or access to a bathroom for Plaintiff or similarly situated workers when they were doing field work.

166. Federal regulations, which are incorporated into the H-2A contract, require Defendants to provide drinking water and access to a bathroom in the fields.

167. One of Plaintiff's coworkers fell ill while working due to the heat. Because of this he was sent back to Mexico. Other workers who were impacted by the heat were sent to rest in a bus in the field that lacked air conditioning. Those workers were not paid for the rest of the day.

This intimidated the other workers from complaining about health and safety issues while working because they thought this could lead to them losing a day's pay.

Living Conditions

168. The Avilez Defendants required Plaintiff and seven coworkers to live in a two-bedroom, 300-square-foot trailer with one bathroom and one kitchen. Two workers slept in each bedroom, and four workers slept in the kitchen. Some of the workers who slept in the kitchen slept on inflatable air mattresses instead of beds.

169. The trailer was severely infested with cockroaches, and there was a colony of stray cats living in the crawl space beneath it.

170. The trailer had no table for cooking and eating; only three chairs for eight people; no fan or air conditioning despite extreme heat; and no bed linens. The only refrigerator was broken. Plaintiff and his coworkers had to spend their own money to make the trailer livable. Plaintiff bought a table to be shared, a portable air conditioner, and bed linens, and he repaired the broken refrigerator himself. Plaintiff and his coworkers also had to purchase their own toilet paper. Plaintiff was never reimbursed for these expenses.

171. Federal regulations and state law require mattresses at least 12 inches off the floor, that each room used for sleeping purposes have an adequate amount of floor space for each occupant, provision of toilet paper, and effective measures be taken to prevent infestation of animals or pests.

172. Upon information and belief, Defendant Avilez provided similar housing to all of its H-2A employees in the 2024 and 2025 agricultural seasons.

173. Plaintiff and his similarly situated coworkers were prohibited from leaving the housing on their own. If they wanted to walk to the nearby Mexican grocery store, they had to ask

permission from Victor Estrada. Estrada told the workers that if they left worker housing without his permission, they would not be rehired to work in the U.S. the following season.

174. The Mexican grocery store was about a 15-minute walk from the housing, with no sidewalk or lighted path. The store closed at 10pm, so the workers could only buy supplies on the rare occasions that they returned to the housing from the field by 9:30 pm or earlier. When Estrada gave them permission to go, they had to find their way there in dark without any sidewalk or light.

175. Once a week Estrada took the H-2A workers on supervised trips to the laundromat and grocery stores.

176. The employer-provided housing was about a twenty-minute drive to the nearest town.

177. Neither Plaintiff nor his similarly situated coworkers had U.S. driver's licenses or access to a car.

178. Defendant Avilez instructed Plaintiff to install a camera at the entry and exit point of the trailer park to monitor who came and went, as well as another camera monitoring the trailers where the workers lived. Plaintiff and his coworkers knew that they were under constant surveillance and understood that Defendant Avilez would find out if they attempted to leave the housing without permission.

179. Upon information and belief, Defendant Avilez had a common policy or practice of refusing to allow H-2A workers to leave and return to employer-provided housing freely.

180. Plaintiff and his similarly situated coworkers had extremely limited contact with the outside world and had limited ability to flee. Although workers were allowed to have their personal cell phones in their housing, there was no Wifi and they could only contact the outside world if they paid for their own data plans.

181. The housing site was geographically isolated and not connected to any public transportation hubs. Plaintiff did not have access to a car and could not apply for a U.S. driver's license without his passport. Under these conditions, even if Plaintiff had chosen to leave the worker housing without permission, his only option was to walk.

Plaintiff's Injury and Retaliation

182. On or about July 21, 2025, Plaintiff suffered a hernia while doing heavy lifting in a packing shed packing watermelons at JFC.

183. Plaintiff immediately reported his injury to Victor Estrada.

184. Plaintiff was operated on for his injury. Supervisor Omar Avilez brought Plaintiff from the hospital back to the labor camp.

185. Plaintiff was unable to perform work for some period of time after his injury and provided several doctor's notes to his employer.

186. At one point, the doctor wrote a note saying Plaintiff could return to work as long as he did not lift more than 20 pounds. Plaintiff provided that note to his employer, but Omar told Plaintiff that he should seek treatment in Mexico rather than the U.S. Omar Avilez said Defendants had no work for him and sent him back to Mexico on August 8, 2025.

187. Defendant Avilez willfully terminated Plaintiff's employment because of his workplace injury.

188. Because of the termination, Plaintiff lost wages he would have earned through the end of the agricultural season in 2026.

189. Plaintiff later filed a worker's compensation claim.

190. Plaintiff was not rehired by the Avilez Defendants for the agricultural season in 2026, even though he was physically able to work in farmwork at that time.

191. Plaintiff was not rehired in retaliation for his workplace injury and for filing a workers' compensation claim.

192. Plaintiff was not paid for his final week of work for Defendants. Due to the unexpected payments Plaintiff was required to make, the debts he had to incur, and the wage deficits, he returned to Mexico without saving any funds for himself or his family.

193. Plaintiff filed a complaint under the REDA with the North Carolina Department of Labor's Retaliatory Employment Discrimination Bureau alleging that he was illegally retaliated against for exercising a protected right. On May 12, 2026, the Retaliatory Employment Discrimination Bureau issued Plaintiff a right-to-sue letter (attached as Exhibit 1).

194. As a result of Defendants' conduct, Plaintiff suffered severe emotional and physical distress. He lost weight, struggled to sleep, and experienced pervasive anxiety and depression.

<u>Discontinuation of Services and Avilez Defendants' Continued Operation</u>

195. On August 14, 2025, the North Carolina Department of Commerce notified Defendant Avilez that it was discontinuing Wagner-Peyser Act Employment Services. The Department of Commerce removed Defendant Avilez's active H-2A job orders from its system and will not process future job orders filed under Defendant Avilez's name while services are discontinued. While the discontinuation of Wagner-Peyser Act Employment Services is in effect, Defendant Avilez is not permitted to lawfully employ H-2A workers in North Carolina.

196. Discontinuation of Wagner-Peyser Act Employment Services occurs when the State Workforce Agency, such as the North Carolina Department of Commerce, Division of Employment Security, finds that an H-2A employer has violated the H-2A regulations. 20 C.F.R. § 658.501(a).

197. Upon information and belief, as of the date of this Complaint, the Department of Commerce has not reinstated Wagner-Peyser Act Employment Services for Defendant Avilez.

198. Upon information and belief, Defendant Avilez, through his agents, is continuing to recruit and employ H-2A workers in North Carolina in 2026.

## VENTURE ALLEGATIONS

199. Defendant JFC knowingly participated in a venture with the Avilez Defendants by:

a. engaging the Avilez Defendants to recruit, hire, obtain, and provide Plaintiff and his similarly situated coworkers to labor for JFC;

b. employing Plaintiff and his similarly situated coworkers to work in fields owned or controlled by JFC, using tools owned by JFC; and

c. supervising the work of Plaintiff and his similarly situated coworkers, including by instructing them on how to perform their work and participating in daily pre-work meetings with them.

200. Defendants' venture violated the Trafficking Victims Protection Act's prohibitions on unlawful conduct with respect to immigration documents; forced labor; and trafficking with respect to Plaintiff and his similarly situated coworkers.

201. Defendant JFC knowingly benefited, attempted or conspired to benefit, and/or received something of value from its participation in a venture with the Avilez Defendants by gaining access to the labor of Plaintiff and his similarly situated coworkers, who were paid at a lower rate than legally required. Upon information and belief, the low wages paid to the Avilez workers resulted in cost savings for Defendant JFC.

202. Defendant JFC also benefited from the venture because it gave them access to a captive labor force. As a result of the forced labor venture, Plaintiff and his similarly situated coworkers were less likely to report the wage violations, passport confiscation, and living and working conditions that they experienced at JFC, or to leave their employment as a result of these violations.

203. Defendant JFC is a large, sophisticated agricultural employer that employs the labor of hundreds of migrant agricultural workers each year and regularly applies for H-2A visas directly. JFC knew or should have known the legal requirements of the H-2A program, including the minimum guarantees required in H-2A job orders.

204. JFC knew or should have known that confiscating migrant agricultural workers' passports in order to compel forced labor by threatening them with deportation and other immigration consequences for abandoning or escaping their employment is a coercive labor condition indicative of labor trafficking.

205. JFC owned or controlled the fields in which Plaintiff and his similarly situated coworkers worked, and JFC employees supervised their work. JFC knew or should have known that they were working extremely long hours, six or seven days a week, with almost no breaks and little to no access to food, water, and restrooms. JFC knew or should have known that these working conditions were in gross violation of the regulations governing the H-2A program, and inconsistent with the representations made to H-2A workers in the applicable job orders.

206. Defendant JFC knew or should have known that the Avilez Defendants knowingly provided and/or obtained the labor of Plaintiff and his similarly situated coworkers by means of threats of serious harm; threatened abuse of law or the legal process; and a scheme, pattern, or plan

intended to cause them to believe that if they did not labor for Defendants, they would suffer serious harm.

207. Defendant JFC knew or should have known that the Avilez Defendants knowingly recruited, harbored, transported, provided, and/or obtained Plaintiff and his similarly situated coworkers for labor in violation of the TVPRA.

208. Defendant JFC knew or should have known that the Avilez Defendants knowingly concealed, removed, confiscated, and/or possessed the passports of Plaintiff and his similarly situated coworkers, without lawful authority, in order to maintain their labor.

209. Defendant JFC knew or should have known that its venture with the Avilez Defendants violated the Trafficking Victims Protection Act's prohibitions on unlawful conduct with respect to immigration documents, forced labor, and trafficking as to Plaintiff and his similarly situated coworkers.

## FLSA COLLECTIVE ACTION ALLEGATIONS

210. Plaintiff Rodríguez Luna seeks to bring his claims under the FLSA pursuant to the collective action procedures specified in 29 U.S.C. § 216(b) on behalf of himself as an individual and all other similarly situated employees of Defendants who worked for the Avilez Defendants at JFC, in any pay period falling within the three chronological years immediately preceding the date on which this action was filed and continuing thereafter through the date on which final judgment is entered in this action: held H-2A visas; were not reimbursed for all of their H-2A related expenses (recruitment, travel, visa, hotel, meals, required fees, and/or border crossing costs) during their first workweek, which resulted in average hourly pay below $7.25 per hour; and timely file (or have already filed) a written consent to be a party to this action pursuant to 29

U.S.C. § 216(b) ("FLSA Reimbursement Collective"). Plaintiff seeks unpaid minimum wages and liquidated damages.

211. Plaintiff also brings claims on behalf of himself and those similarly situated employees of Defendants who worked for the Avilez Defendants at JFC and who held H-2A visas and who were not compensated at the minimum wage rate during some workweeks because they were paid a piece rate, were not paid for travel time between fields, were required to pay for work-related equipment and/or a Social Security card, were not paid for partial hours worked, were not paid for required maintenance work at worker housing, and/or were required to kick back part of their wages ("FLSA Underpayment Collective"). Plaintiff seeks unpaid minimum wages and liquidated damages.

212. Plaintiff and the members of the Collectives are similarly situated. Plaintiff and the FLSA Reimbursement Collective and FLSA Underpayment Collective members were all non-supervisory H-2A employees who worked for the Avilez Defendants performing farm work at JFC and were each paid wages less than those required by 29 U.S.C. § 206 during some workweeks that they were employed by one or more Defendants pursuant to common policies implemented by Defendants.

## CLASS ALLEGATIONS

### Trafficking Class

213. Plaintiff brings his TVPRA and NC Trafficking Law claims for damages on behalf of himself and a class of persons ("Trafficking Class") consisting of "All individuals who were brought to the U.S. by one or more of the Avilez Defendants to perform agricultural work at Jackson Farming Company under H-2A contracts; who performed work during the ten-year period immediately preceding the date on which this action was filed."

214. The trafficking violations occurred when the Avilez Defendants confiscated the passports of the members of the Trafficking Class in order to, without lawful authority, maintain, prevent, or restrict the labor or services of the individual, or, alternatively, in the course of violating Section 1351 of Title 18 of the U.S. Code.

215. The trafficking violations also occurred when the Avilez Defendants systematically threatened Trafficking Class members with deportation and blacklisting, denied putative Class members their full wages, charged illegal recruitment fees, isolated and surveilled putative Class members, instructed putative Class members to lie to federal government investigators, and caused putative Class members to believe that they would suffer legal and economic harm if they left their employment.

NCWHA Class and Subclass

216. Plaintiff seeks to represent a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure for back wages and liquidated damages under N.C. Gen. Stat. §§ 95-25.6, 95-25.22, and 95-25.22(a1) consisting of "All individuals who were brought to the U.S. by one or more of the Avilez Defendants to perform agricultural work at Jackson Farming Company under H-2A contracts during any pay period falling within two years prior to the date of this Complaint and continuing until the date final judgment is entered who did not receive all of their wages when due" ("NCWHA Class").

217. The promised wage violations occurred when putative Class members were paid less than the AEWR because Defendants failed to reimburse Class members for their recruitment, transportation, required fees, visa, lodging, and/or border crossing expenses during the first week in which they performed labor for Defendants.

218. The promised wage violations also occurred due to multiple payment practices of Defendants, including: paying a piece rate that resulted in an average hourly wage lower than the AEWR; paying an hourly wage that was less than the AEWR; not paying putative Class members for compensable time spent traveling between work locations during the work day or for partial hours; requiring putative Class members to purchase work-related equipment and not reimbursing them; requiring putative Class members to perform unpaid maintenance tasks at the worker housing; and requiring putative Class members to kick back money from their paychecks during many workweeks.

219. Plaintiff also seeks to represent a subclass pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure for back wages and liquidated damages under N.C. Gen. Stat. §§ 95-25.6, 95-25.8, 95-25.22, and 95-25.22(a1) consisting of "All NCWHA Class Members who had money deducted from their paychecks by Defendants for Social Security cards ("Deductions Subclass").

220. The deductions violation occurred when Defendants made deductions from the Plaintiff and putative Subclass members' paychecks for an illegal charge related to obtaining Social Security cards when the putative Subclass members did not provide the authorization required by N.C. Gen. Stat. § 95-25.8 and because the deductions brought their pay below the promised wage.

221. Plaintiff's NCWHA class allegations are based on applicable AEWR rates of pay and not minimum wage or overtime, and the NCWHA claims are separate and distinct from any FLSA minimum wage and overtime claims.

Contract Classes

222. Plaintiff brings a North Carolina common law claim on behalf of himself and a class of persons consisting of "All individuals who were brought to the U.S. as H-2A workers by the Avilez Defendants under the 2024 Contract" ("2024 Contract Class").

223. Plaintiff also brings a North Carolina common law claim on behalf of himself and a class of persons consisting of "All individuals who were brought to the U.S. as H-2A workers by the Avilez Defendants under the 2025 Contract" ("2025 Contract Class").

224. The contracts were breached by the Avilez Defendants when they did not reimburse Contract Class members for their recruitment, visa, transportation, meals, required fees, lodging and related expenses in their first workweek; did not pay them at the contract wage rate; did not pay for return transportation; confiscated their passports; did not pay them the AEWR; did not provide complete and accurate pay statements; and did not provide field sanitation (water and restrooms) in the fields.

Exclusions from the Classes

225. Excluded from the Classes and Subclass above (collectively, the "Classes") are the legal representatives, officers, directors, assigns, and successors of Defendants; any individual who at any time during the class period has had a controlling interest in any Defendant; Defendants' supervisory employees; and all persons who submit timely and otherwise proper requests for exclusion from the Classes.

Class Treatment of These Claims is Appropriate.

226. The Classes are so numerous and so geographically dispersed as to make joinder impractical. The Avilez Defendants received H-2A temporary labor certifications from the U.S. Department of Labor for approximately 120 openings from 2024 to 2025. Therefore, the NCWHA

classes could include as many as 120 individuals. The classes are entirely composed of temporary foreign workers whose permanent residence is outside the United States, mostly in Mexico. Most if not all of the members of these classes are not fluent or literate in English and are unfamiliar with the American judicial system. The relatively small size of the individual claims and the indigence of the members of these classes make the maintenance of separate actions by each member of these classes infeasible.

227. The questions of law and fact which are common to members of the Trafficking Class include, among others:

a. whether the Avilez Defendants concealed, removed, confiscated, and/or possessed Plaintiff's and other putative Class members' passports, visas, and/or Social Security cards in order to, without lawful authority, maintain the labor or services of putative Class members;

b. whether the Avilez Defendants threatened Plaintiff and other putative Class members with legal and economic harm if they left their employment;

c. whether the Avilez Defendants systematically charged putative Class members recruitment and other fees;

d. whether the Avilez Defendants required Plaintiff and other putative Class members to pay for their own travel, visa, hotel, meals, required fees, and/or border crossing costs expenses;

e. what the terms of Plaintiff and other putative Class members' job offer were;

f. whether the Avilez Defendants complied with the terms of the job offers;

g. the conditions of the worker housing provided by the Avilez Defendants;

h. the labor conditions of putative Class members in the fields;

i. whether the Avilez Defendants instructed putative Class members to lie to federal government investigators;

j. whether any of Defendants' conduct was done in order to knowingly provide or obtain labor or services by means of serious harm or threats of serious harm; the abuse or threatened abuse of the law or legal process; or by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint;

k. whether the Avilez Defendants knowingly recruited, harbored, transported, provided, or obtained by any means, any person for labor or services in violation of the TVPRA;

l. whether the Avilez Defendants' conduct violated the TVPRA and/or North Carolina Human Trafficking Law;

m. whether Defendant JFC knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from its participation in a venture with the Avilez Defendants;

n. whether the venture violated the TVPRA as to the putative Trafficking Class members;

o. whether Defendant JFC had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the putative Trafficking Class members;

p. whether Defendant JFC knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from its participation in a venture with the Avilez Defendants that violated the TVPRA; and

q. the nature and extent of class-wide injury, and the measure of damages for those injuries.

228. The questions of law and fact which are common to members of the putative NCWHA Class include, among others:

a. whether Defendants disclosed to Plaintiff and the members of the putative Class pursuant to N.C. Gen. Stat. §§ 95-25.13(1)-(2) and 13 N.C.A.C. § 12.0803 that they would pay wages at the adverse effect wage rate for the work they performed;

b. whether Defendants reimbursed Plaintiff and members of the putative NCWHA Class for their recruitment, transportation, visa, meals, required fees, hotel and border crossing costs during the first work week;

c. whether Defendants failed to pay Plaintiff and members of the putative NCWHA Class for all hours worked, including travel time between work locations, partial hours, and hours spent performing required maintenance at the worker housing;

d. whether Defendants' practice of paying a piece rate for some types of work resulted in payment below the promised wage;

e. whether Defendants compensated Plaintiff and the putative NCWHA Class at an hourly rate less than the AEWR;

f. whether Defendants required Plaintiff and the putative NCWHA Class members to purchase work-related equipment;

g. whether Defendants required Plaintiff and the putative NCWHA Class Members to repay or kick back some of their wages; and

h. whether Defendant JFC was the employer of Plaintiff and the members of the putative NCWHA Class.

229. The questions of law and fact which are common to putative members of the Deductions Subclass are:

a. whether the putative Subclass members provided written authorization for any deductions;

b. whether the deductions for Social Security were illegal because they violated 42 U.S.C. § 1320b-10(a)(4);

c. whether the deductions brought their pay below the promised wage; and

d. whether Defendant JFC was the employer of Plaintiff and the members of the putative Deductions Subclass.

230. The questions of law and fact which are common to members of the putative 2024 Contract Class include, among others:

a. whether the Avilez Defendants and the members of the putative 2024 Contract Class entered into a contract;

b. what the terms of the contract were; and

c. whether Defendants breached the terms of that contract.

231. The questions of law and fact which are common to members of the putative 2025 Contract Class include, among others:

a. whether the Avilez Defendants and the members of the putative 2025 Contract Class entered into a contract;

b. what the terms of the contract were; and

c. whether Defendants breached the terms of that contract.

232. Members of the putative Classes have been subject to the same unlawful practices of Defendants, and their claims arise out of these same practices. Plaintiff's claims are typical of the claims of the members of the various putative Classes, because, among other things, Plaintiff was an employee who worked for Defendants and suffered the same violations as members of the putative Classes.

233. Those typical, common claims predominate over any questions affecting only individual Class members.

234. Plaintiff and members of the various putative Classes suffered similar types of damages.

235. Plaintiff has the same interests as other members of the putative Classes and will vigorously prosecute these interests on behalf of the Classes. Plaintiff has no interest adverse to the members of the putative Classes.

236. Plaintiff will fairly and adequately represent the interests of the Classes. His interests do not conflict with the interests of the members of the Classes he seeks to represent.

237. The undersigned counsel Carol Brooke, Clermont Ripley, and Abigail Kerfoot are experienced litigators who have been named counsel for several class actions involving similar claims to those being raised in this action. Plaintiff's counsel are prepared to advance litigation costs necessary to vigorously litigate this action and to provide notice to the members of the classes.

238. A class action under Rule 23(b)(3) is superior to other available methods of adjudicating this controversy because, *inter alia*:

a. The common issues of law and fact, as well as the relatively small size of the individual claims of each member of the classes, substantially diminish the interest of members of the classes in individually controlling the prosecution of separate actions;

b. Many members of the classes are unaware of their rights to prosecute these claims and lack the means or resources to secure legal assistance;

c. Upon information and belief, there is no pending litigation against the Avilez Defendants for their confiscation of employees' passports or other documents in order to unlawfully maintain the employees' labor;

d. Upon information and belief, there is no pending litigation against Defendants for their failure to pay wages to their employees as required by the FLSA, H-2A program regulations, NCWHA, or North Carolina contract law;

e. It is desirable that the claims be heard in this forum because all Defendants reside in this district and the cause of action arose in this district;

f. A class action can be managed without undue difficulty because Defendants regularly committed the violations complained of herein, and were required to maintain detailed records concerning each member of the classes above.

FIRST CLAIM FOR RELIEF
TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
Unlawful Conduct in Respect to Immigration Documents in Violation of 18 U.S.C. §§ 1597 and 1595
*Class Claim Against All Defendants*

239. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

240. As set forth in 18 U.S.C. § 1595, the TVPRA allows victims to "bring a civil action against . . . whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

241. Plaintiff brings claims for himself and other members of the putative Trafficking Class, defined in paragraph 213, against Defendants for violations of 18 U.S.C. § 1597, pursuant to the civil remedies provision of the TVPRA (18 U.S.C. § 1595).

242. The Avilez Defendants knowingly concealed, removed, confiscated, and/or possessed the passports of Plaintiff and the members of the putative Trafficking Class in order to, without lawful authority, maintain their labor or services, in violation of 18 U.S.C. § 1597.

243. Defendant JFC knowingly participated in a venture with the Avilez Defendants by:

a. engaging the Avilez Defendants to recruit, hire, obtain, and provide members of the putative Trafficking Class to labor for JFC;

b. employing members of the putative Trafficking Class to work in fields owned or controlled by JFC, using tools owned by JFC; and

c. supervising the work of members of the putative Trafficking Class, including by instructing them on how to perform their work and participating in daily pre-work meetings with them.

244. Defendants' venture violated the Trafficking Victims Protection Act's prohibitions on unlawful conduct with respect to immigration documents as to Plaintiff and his similarly situated coworkers.

245. Defendant JFC knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from its participation in a venture with the Avilez Defendants by gaining access to the labor of Plaintiff and his similarly situated coworkers, who were paid at a lower rate than legally required by the AEWR. The Avilez Defendants knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from their participation in a venture with JFC by providing access to the labor of Plaintiff and his similarly situated coworkers to JFC in exchange for payment.

246. Defendants knew or should have known that their venture violated the Trafficking Victims Protection Act's prohibitions on unlawful conduct with respect to immigration documents as Plaintiff and his similarly situated coworkers.

247. As a proximate result of the conduct of Defendants, Plaintiff and the other members of the putative Trafficking Class have suffered financial and other damages, including emotional distress.

248. Under the TVPRA, Plaintiff and the other members of the putative Trafficking Class are entitled to recover:

a. compensatory damages in an amount to be proven at trial, including damages for emotional distress;

b. punitive damages; and

c. attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

SECOND CLAIM FOR RELIEF
TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
Forced Labor in Violation of 18 U.S.C. §§ 1589 and 1595
*Class Claim Against All Defendants*

249. Plaintiff realleges and incorporates by reference each of the allegations contained in all preceding paragraphs.

250. Plaintiff brings claims for himself and other members of the putative Trafficking Class, defined in paragraph 213, against the Defendants under the civil remedies provision of the TVPRA for violations of 18 U.S.C. §§ 1589 and 1595.

251. As set forth in 18 U.S.C. § 1595, the TVPRA allows victims to "bring a civil action against . . . whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

252. The Avilez Defendants knowingly provided and/or obtained the labor of Plaintiff and members of the putative Trafficking Class by means of threats of serious harm; threatened abuse of law or the legal process; and a scheme, pattern, or plan intended to cause them to believe that if they did not labor for Defendants, they would suffer serious harm, in violation of 18 U.S.C. § 1589.

253. The Avilez Defendants knowingly compelled Plaintiff and members of the putative Trafficking Class to labor against their will by, *inter alia*, threatening to deport and blacklist them from the H-2A program if they left their employment, confiscating their passports and identity documents, subjecting them to appalling living and working conditions, paying illegally low wages, mandating exorbitant recruitment fees, isolating them from the outside world, instructing them to lie to federal government investigators, and exploiting their limited English proficiency and familiarity with the U.S. legal system, all of which caused serious harm or threat of serious harm under 18 U.S.C. § 1589(a)(2).

254. The Avilez Defendants knowingly compelled Plaintiff and putative Trafficking Class members to work against their will by confiscating their travel documents and by threatening them with deportation and permanent bans from the United States and the H-2A program if they failed to yield to their demands, in a manner that constituted an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

255. The Avilez Defendants knowingly compelled Plaintiff and members of the putative Trafficking Class to work against their will by a scheme, plan, or pattern of abuse and legal threats, which, in the totality of the circumstances, was intended to cause and did cause putative Trafficking Class members to believe that they would suffer deportation and economic devastation if they were to leave the employ of the Defendants in violation of 18 U.S.C. § 1589(a)(4).

256. Defendant JFC knowingly participated in a venture with the Avilez Defendants by:

a. engaging the Avilez Defendants to recruit, hire, obtain, and provide members of the putative Trafficking Class to labor for JFC;

b. employing members of the putative Trafficking Class to work in fields owned or controlled by JFC, using tools owned by JFC; and

c. supervising the work of members of the putative Trafficking Class, including by instructing them on how to perform their work and participating in daily pre-work meetings with them.

257. Defendants' venture violated the TVPRA's prohibitions of forced labor as to Plaintiff and members of the putative Trafficking Class.

258. Defendant JFC knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from its participation in a venture with the Avilez Defendants by gaining access to the labor of members of the putative Trafficking Class, who were paid at a

lower rate than legally required by the AEWR. Upon information and belief, the low wages paid to members of the putative Trafficking Class resulted in cost savings for JFC.

259. Defendant JFC also knowingly benefited from the venture because it gave them access to a captive labor force. As a result of the forced labor venture, members of the putative Trafficking Class were less likely to report the wage violations, passport confiscation, and living and working conditions that they experienced at JFC, or to leave their employment as a result of these violations.

260. The Avilez Defendants knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from their participation in a venture with JFC by providing access to the labor of members of the putative Trafficking Class to JFC in exchange for payment.

261. Defendants knew or should have known that their venture violated the TVPRA's prohibitions on forced labor as to Plaintiff and members of the putative Trafficking Class.

262. As a proximate result of the conduct of Defendants, Plaintiff and the other members of the putative Trafficking Class have suffered financial and other damages, including emotional distress.

263. Under the TVPRA, Plaintiff and the other members of the putative Trafficking Class are entitled to recover:

a. compensatory damages in an amount to be proven at trial, including damages for emotional distress;

b. punitive damages; and

c. attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

<u>THIRD CLAIM FOR RELIEF</u>
TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
Trafficking in Violation of 18 U.S.C. §§ 1590 and 1595
*Class Claim Against All Defendants*

264. Plaintiff realleges and incorporates by reference each of the allegations contained in all preceding paragraphs.

265. Plaintiff brings claims for himself and other members of the putative Trafficking Class, defined in paragraph 213, against the Defendants under the civil remedies provision of the TVPRA for violations of 18 U.S.C. §§ 1590 and 1595.

266. As set forth in 18 U.S.C. § 1595, the TVPRA allows victims to "bring a civil action against . . . whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]."

267. It is a violation of 18 U.S.C. § 1590(a) to knowingly recruit, harbor, transport, provide, and/or obtain by any means, any person for labor or services in violation of the TVPRA.

268. As alleged herein, the Avilez Defendants attempted to and did violate the prohibition against forced labor set forth in 18 U.S.C. § 1589 as to Plaintiff and other members of the putative Trafficking Class, and the prohibition against trafficking set forth in 18 U.S.C. § 1590.

269. The Avilez Defendants knowingly recruited, harbored, transported, provided, and/or obtained Plaintiff and putative Trafficking Class members, bringing them to the United States on an H-2A visa, for the purpose of forced labor in violation of the trafficking provision of the TVPRA, 18 U.S.C. § 1590(a). The Avilez Defendants recruited Plaintiff and putative Trafficking Class members in their countries of origin; transported them to the worksite in the U.S. and harbored them there; and obtained and provided them for the purpose of forced labor in agriculture.

270. As alleged herein, Defendant JFC knowingly participated in a venture with the Avilez Defendants to recruit, harbor, transport, provide, and/or obtain Plaintiff and putative Trafficking Class members for the purpose of forced labor in violation of the trafficking provision of the TVPRA, 18 U.S.C. § 1590(a).

271. As set forth above, Defendant JFC knowingly benefited and/or attempted or conspired to benefit, and/or received something of value from its participation in the venture.

272. Defendant JFC knew or should have known that through their venture, the Avilez Defendants knowingly recruited, harbored, transported, provided, and/or obtained Plaintiff and other members of the putative Trafficking Class for forced labor in violation of the TVPRA.

273. As a proximate result of the conduct of Defendants, Plaintiff and the other members of the putative Trafficking Class have suffered financial and other damages, including emotional distress.

274. Under the TVPRA, Plaintiff and the other members of the putative Trafficking Class are entitled to recover:

a. compensatory damages in an amount to be proven at trial, including damages for emotional distress;

b. punitive damages; and

c. attorneys' and experts' fees and costs as authorized by 18 U.S.C. § 1595.

## FOURTH CLAIM FOR RELIEF
## NORTH CAROLINA HUMAN TRAFFICKING LAW
## N.C. Gen. Stat. § 14-43.18
*Class Claim Against All Defendants*

275. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

276. Plaintiff brings this civil claim pursuant to the civil remedy provisions of the North Carolina Human Trafficking Act, N.C. Gen. Stat. §§ 14-43.18, *et seq.,* on behalf of himself and other members of the Trafficking Class, as defined in paragraph 213.

277. The Avilez Defendants, by and through their agents, engaged in involuntary servitude by knowingly recruiting, providing, or obtaining the labor of Plaintiff and Trafficking Class members by means of deception, coercion, or intimidation, including by:

a. knowingly making false representations on the 2024 and 2025 applications and accompanying job orders submitted to USDOL for approval;

b. confiscating and possessing the passports and visas, of Plaintiff and members of the Trafficking Class;

c. threatening Plaintiff and members of the Trafficking Class that they would be deported and/or be unable to obtain an H-2A visa in the future if they left their employment before the end of the contract;

d. subjecting Plaintiff and members of the Trafficking Class to appalling living and working conditions;

e. paying Plaintiff and members of the Trafficking Class illegally low wages and mandating exorbitant recruitment fees;

f. isolating Plaintiff and members of the Trafficking Class from the outside world;

g. instructing Plaintiff and members of the Trafficking Class to lie to federal government investigators; and

h. exploiting Plaintiff and members of the Trafficking Class's limited English proficiency and familiarity with the U.S. legal system.

278. JFC, by and through its agents, knowingly benefited or received something of value by participating in a venture with the Avilez Defendants, which JFC knew or should have known violated N.C. Gen. Stat. § 14-43.12(a).

279. JFC participated in a venture with the Avilez Defendants by engaging Avilez to recruit workers to work in fields owned or controlled by JFC, supervised by JFC employees and using tools owned by JFC.

280. JFC knowingly benefited or received something of value from its participation in its venture with the Avilez Defendants by gaining access to more migrant laborers, who were paid at a lower rate than legally required by the AEWR. Upon information and belief, the low wages paid to members of the putative Trafficking Class resulted in cost savings for JFC.

281. Defendant JFC also benefited from the venture because it gave them access to a captive labor force. As a result of the forced labor venture, members of the putative Trafficking Class were less likely to report the wage violations, passport confiscation, and living and working conditions that they experienced at JFC, or to leave their employment as a result of these violations.

282. JFC knew or should have known that its venture with the Avilez Defendants violated N.C. Gen. Stat. § 14-43.12(a).

283. For these violations, Plaintiff and Trafficking Class members have suffered injury and are entitled to recover:

a. compensatory damages and general damages for non-economic losses in an amount to be proven at trial, including damages for emotional distress; and

b. attorneys' and experts' fees and costs as authorized by N.C. Gen. Stat. § 14-43.18.

## FIFTH CLAIM FOR RELIEF
NORTH CAROLINA WAGE AND HOUR ACT
N.C. Gen. Stat. § 95-25.6
*Class Claims Against All Defendants*

284. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

285. Defendants failed to pay Plaintiff and the members of the putative NCWHA Class defined in paragraph 216 at least the promised wage for each hour or part of an hour that Plaintiff and the members of the putative NCWHA Class worked for Defendants for each workweek, in violation of N.C. Gen. Stat. § 95-25.6.

286. Defendants failed to reimburse Plaintiff during his first week of employment for expenses incurred primarily for the benefit of Defendants, including recruitment fees; inbound subsistence costs; lodging expenses near the U.S. Consulate; visa fees and visa-related processing fees; border crossing fees; other required fees; and the full cost of travel from the place of recruitment to the jobsite. Defendants' failure to fully reimburse Plaintiff during the first workweek caused his first week's earnings to be less than the promised wage.

287. Defendants failed to compensate Plaintiff and the members of the putative NCWHA Class defined in paragraph 216 the promised wage for all hours worked by paying them a piece rate; failing to pay them for travel time between fields; failing to pay for partial hours worked; failing to pay them for required maintenance labor at the worker housing; requiring them to pay for work-related equipment; and requiring them to kick back part of their wages; which brought their wages below the promised AEWR rate.

288. Defendants also failed to compensate Plaintiff and members of the putative Deductions Subclass defined in paragraph 219 the promised wage for all hours worked by making deductions for Social Security cards.

289. As a result of these actions, Defendants are in violation of Plaintiff's and the members of the putative NCWHA Class's rights under N.C. Gen. Stat. §§ 95-26.6 and 95-25.8. Plaintiff seeks unpaid wages and liquidated damages, costs, and attorneys' fees that may be recovered from Defendants under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a)(1).

## SIXTH CLAIM FOR RELIEF
## NORTH CAROLINA COMMON LAW OF CONTRACT
*Class Claim Against Avilez Defendants*

290. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

291. Defendant Avilez entered into contracts with Plaintiff and his coworkers in 2024 and 2025, the terms of which were the required terms of the corresponding job orders and applications for temporary employment certification. 20 C.F.R. §§ 655.121, 655, 122, and 655.135.

292. In 2024, Defendant Avilez offered employment on the terms and conditions set out in the 2024 Contract, and Plaintiff and similarly situated workers accepted Defendant's offer.

293. In 2025, Defendant Avilez offered employment on the terms and conditions set out in the 2025 Contract, and Plaintiff and similarly situated workers accepted Defendant's offer.

294. Defendant Avilez breached each of their employment contracts with Plaintiff and the members of the 2024 and 2025 Contract Classes defined in paragraphs 222 and 223 by charging a recruitment fee; failing to pay for or reimburse them for costs related to their travel to North Carolina; not paying them at the contract wage rate; requiring them to kick back money; not providing accurate and complete pay statements; confiscating their passports; failing to provide water and restrooms in the fields; and not paying for their return transportation to Mexico.

295. Defendant Avilez's breach of his employment contracts with Plaintiff and the members of the Contract Classes caused substantial injuries.

296. Defendant Avilez is liable to Plaintiff and the members of the Contract Classes for damages that arose naturally and according to the usual course of things from the Defendants' breach, as provided by federal common law and/or North Carolina common law, and prejudgment interest.

297. Defendant Avilez & Sons is also liable to Plaintiff and the members of the Contract Classes for damages as the continuation and/or successor of Defendant Avilez d/b/a Alvino Avilez Contractor.

<u>SEVENTH CLAIM FOR RELIEF</u>
FAIR LABOR STANDARDS ACT: MINIMUM WAGE
29 U.S.C. § 201 *et seq.*
*Collective Action Claims Against All Defendants*

298. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

299. Plaintiff brings this claim for Defendants' violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*, on behalf of himself and all others similarly situated.

300. Plaintiff has consented in writing to bring this FLSA action and has filed his written consent as an attachment to this Complaint. *See* DE 1-1.

301. Defendants violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiff and the members of the putative Collectives described in Paragraphs 210 and 211 at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in each workweek during which they were employed.

302. Defendants willfully failed to fully reimburse Plaintiff and members of the FLSA Reimbursement Collective Action during their first week of employment for expenses incurred primarily for the benefit of Defendants, including their recruitment fees; in-bound subsistence costs; lodging expenses near the U.S. Consulate; visa fees and visa-related processing fees; border crossing fees; other required fees; and the full cost of travel from the place of recruitment to the jobsite, in violation of the FLSA.

303. When these expenses are calculated as deductions from their first week's pay, as required by law, they cause the first-week wages of Plaintiff and the members of the putative FLSA Reimbursement Collective to be less than the FLSA minimum wage.

304. Defendants also failed to compensate Plaintiff and members of the putative FLSA Underpayment Collective at the minimum wage rate for all hours worked when Defendants paid Plaintiff and members of the putative FLSA Underpayment Collective at a piece rate; failed to pay them for travel time between fields; failed to pay for partial hours worked; failed to pay them for required maintenance labor at the worker housing; charged them for Social Security cards; required them to pay for work-related equipment; and required them to kick back part of their wages, resulting in wages that amounted to less than the minimum wage rate for each hour worked, in violation of the FLSA.

305. Defendants knew that they were required to pay Plaintiff and members of the putative FLSA Collectives at least the Federal minimum wage for each hour worked during a workweek or showed reckless disregard as to whether their conduct was prohibited by the FLSA and its accompanying regulations. As such, Defendants' failure to pay Plaintiff and members of the putative FLSA Collectives the minimum wage was willful within the meaning of 29 U.S.C. § 255.

306. As a consequence of Defendants' willful violation of his rights under the FLSA, Plaintiff seeks unpaid minimum wages, plus an equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b), on behalf of himself and the members of the putative FLSA Collectives.

## EIGHTH CLAIM FOR RELIEF
## FAIR LABOR STANDARDS ACT
## 29 U.S.C. § 201 *et seq.*
## *Plaintiff Rodriguez Luna Against All Defendants*

307. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

308. Plaintiff brings individual claims for Defendants' violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.

309. Defendants violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiff at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in his final week of work in 2025 and the total number of hours spent improving the migrant housing.

310. As a consequence of Defendants' violation of their rights under the FLSA, Plaintiff seeks unpaid minimum and overtime wages, plus an equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b).

## NINTH CLAIM FOR RELIEF
## NORTH CAROLINA WAGE AND HOUR ACT
## N.C. Gen. Stat. §§ 95-26.6
## *Plaintiff Rodriguez Luna Against All Defendants*

311. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

312. Plaintiff additionally brings individual claims for unpaid wages for the time he was not paid in his final week of work in 2025, for which he was not compensated at the AEWR, which was the wage promised to him.

313. Plaintiff also brings individual claims for unpaid wages for the time he spent improving worker housing, for which he was not compensated at the AEWR, which was the wage promised to him.

314. As a result of these actions, Defendants violated Plaintiff's rights under N.C. Gen. Stat. §§ 95-26.6. Plaintiff seeks unpaid wages and liquidated damages, costs, and attorneys' fees that may be recovered from Defendants under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a)(1).

## TENTH CLAIM FOR RELIEF
## NC RETALIATORY EMPLOYMENT DISCRIMINATION ACT
## N.C. Gen. Stat. § 95-240
*Plaintiff Rodriguez Luna Against Avilez Defendants*

315. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

316. By terminating Plaintiff's employment, the Avilez Defendants unlawfully discriminated against him and retaliated against him for his exercise of his rights to file a claim or complaint, initiate any inquiry, investigation, proceeding or other action with respect to the North Carolina Workers' Compensation Act, in violation of N.C. Gen. Stat. § 95-241(a)(1)(a.).

317. The Avilez Defendants' termination of Plaintiff was a "retaliatory action" within the meaning of N.C. Gen. Stat. § 95-240(2) and was a discriminatory or retaliatory action against Plaintiff within the meaning of N.C. Gen. Stat. § 95-241(a). The termination of Plaintiff's employment was therefore unlawful.

318. In accordance with N.C. Gen. Stat. § 95-242, Plaintiff timely filed a complaint with the NC Department of Labor against Defendant Avilez alleging unlawful retaliation and discrimination against him for asserting his rights under the NC Workers' Compensation Act.

319. The Department of Labor issued Plaintiff a right-to-sue letter on May 12, 2026.

320. This claim is timely filed within ninety days of May 12, 2026 as provided by N.C. Gen. Stat. § 95-243(b).

321. The Avilez Defendants' retaliatory and discriminatory behavior proximately caused Plaintiff to suffer damages in an amount to be determined at trial.

322. The Avilez Defendants' termination of Plaintiff because of his exercise of his rights under the NC Workers' Compensation Act was intentional and willful, within the meaning of N.C. Gen. Stat. § 95-243(c), entitling Plaintiff to recover treble damages.

## ELEVENTH CLAIM FOR RELIEF
## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
## N.C. Gen. Stat. § 95-240
*Plaintiff Rodriguez Luna Against the Avilez Defendants*

323. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

324. The public policy of North Carolina, as expressed in N.C. Gen. Stat. § 95-240, *et seq*., protects employees against retaliatory action and discrimination for exercising their statutory rights under the North Carolina Workers' Compensation Act, including filing a claim or complaint, or initiating or threatening to initiate any inquiry, investigation, inspection, proceeding or other action pursuant to Chapter 97 of the General Statutes.

325. The Avilez Defendants violated the public policy of North Carolina by terminating Plaintiff because he exercised his rights under the Workers' Compensation Act.

326. The Avilez Defendants' wrongful discharge of Plaintiff in violation of the express public policy of North Carolina is actionable under North Carolina law.

327. As a proximate result of the Avilez Defendants' wrongful discharge of Plaintiff, Plaintiff has suffered lost income, emotional distress, anxiety, humiliation, expenses, and other damages in an amount to be determined at trial, and is entitled to recover compensatory damages.

328. The Avilez Defendants' actions were done maliciously, willfully, or wantonly, and/or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages.

329. The Avilez Defendants are liable to Plaintiff for wrongfully discharging him and Defendant Avilez & Sons is liable as a successor of Defendant Avilez.

## CLAIM FOR DECLARATORY RELIEF

330. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

331. The named Plaintiff and members of the putative FLSA Collectives and Rule 23 Classes that Plaintiff seeks to represent are in dispute as to their respective rights, privileges, obligations, and liabilities under the TVPRA, FLSA, and NCWHA, and require declaratory relief as to what those respective rights, privileges, obligations, and liabilities are.

## JURY DEMAND

332. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Honorable Court enter an order:

a. Finding that this Court has jurisdiction over Plaintiff's claims;

b. Granting a jury trial on all issues so triable;

c. Certifying this case as a class action, pursuant to Rule 23(b)(3), as to Claims for Relief One, Two, Three, Four, Five, and Six, naming Plaintiff Fernando Javier Rodríguez Luna as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

d. Declaring that the Defendants, by the acts and omissions described above, violated Plaintiff's rights and the rights of the members of the Trafficking Class under the TVPRA at 18 U.S.C. §§ 1597, 1589, 1590, and 1595 as set forth in Plaintiff's First, Second, and Third Claims for Relief;

e. Granting judgment to Plaintiff and the members of the Trafficking Class and awarding them damages as provided for by statute;

f. Granting judgment in favor of Plaintiff and the members of the NCWHA Class and Subclass on their NCWHA claims, as set forth in the Plaintiff's Fifth Claim for Relief, and awarding Plaintiff monetary damages for unpaid promised wages, plus liquidated damages in an equal amount and interest, court costs, and attorneys' fees, as provided by N.C. Gen. Stat. § 95-25.6;

g. Declaring that Defendants, by the acts and omissions described above, violated Plaintiff's rights and the rights of the members of the 2024 and 2025 Contract Classes under the common law of contracts, as set forth in Plaintiff's Sixth Claim for Relief;

h. Granting judgment awarding Plaintiff and the members of the 2024 and 2025 Contract Classes their actual damages for the Defendants' breach of their employment contracts;

i. Declaring this action to be maintainable as a FLSA collective action as to Plaintiff's Seventh Claim for Relief pursuant to 29 U.S.C. § 216(b), allowing Plaintiff to provide notice of this action to potential opt-in plaintiffs, and allowing those individuals who choose to do so to opt-in to this action;

j. Declaring that Defendants, by the acts and omissions described above, willfully violated Plaintiff's rights and the rights of the members of the FLSA Collectives that he seeks to represent under the minimum wage provisions of the FLSA at 29 U.S.C. §§ 206(a) as set forth in Plaintiff's Seventh Claim for Relief;

k. Granting judgment in favor of Plaintiff on his FLSA claims and awarding Plaintiff and his similarly situated co-workers monetary damages for unpaid minimum wages, plus liquidated damages in an equal amount and interest, costs, and attorneys' fees, as provided by 29 U.S.C. § 216(b);

l. Granting judgment in favor of Plaintiff on his individual FLSA claims and awarding Plaintiff monetary damages for unpaid minimum wages, plus liquidated damages in an equal amount and interest, costs, and attorneys' fees, as provided by 29 U.S.C. § 216(b);

m. Granting judgment in favor of Plaintiff on his individual NCWHA claims, as set forth in Plaintiff's Ninth Claim for Relief, and awarding Plaintiff monetary damages for unpaid promised wages, plus liquidated damages in an equal

amount and interest, court costs, and attorneys' fees, as provided by N.C. Gen. Stat. § 95-25.6;

n. Declaring that the Avilez Defendants' practices complained of herein are unlawful under the REDA, as set forth in Plaintiff's Tenth Claim for Relief;

o. Granting judgment to Plaintiff against Defendants and ordering Defendants to pay Plaintiff compensatory damages, including unpaid wages, as well as exemplary, liquidated, punitive and/or treble damages pursuant to the REDA;

p. Granting judgment to Plaintiff against Defendant Avilez for lost wages, economic losses, and compensatory damages suffered by Plaintiff as a proximate result of Defendant Avilez's willful violation of the public policy of North Carolina, plus exemplary and/or punitive damages, in connection with Plaintiff's Eleventh Claim for Relief;

q. Awarding Plaintiff pre- and post-judgment interest, as allowed by law;

r. Awarding Plaintiff and the Class members their costs and reasonable attorneys' fees;

s. Permanently enjoining Defendants from further violations of the TVPRA, the NCWHA, the FLSA and the REDA; and

t. Granting such injunctive, declaratory, and further relief as this Court deems just and appropriate.

Respectfully submitted, this the 24th day of July, 2026.

OF COUNSEL:
North Carolina Justice Center
P.O. Box 28068
Raleigh, NC 27611
Telephone: 919-856-2154
Facsimile: 919-856-2175

/s/ Clermont Ripley
Clermont Ripley
N.C. State Bar No. 36761
clermont@ncjustice.org

/s/ Carol L. Brooke
Carol L. Brooke
N.C. State Bar No. 29126
carol@ncjustice.org

Centro de los Derechos del Migrante, Inc.
711 W. 40th St., Unit 412
Baltimore, MD 21211
Telephone: (410) 783-0236

/s/ Abigail Kerfoot*
Abigail Kerfoot
California State Bar No. 335970
abigail@cdmigrante.org
*Pro hac vice forthcoming*

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing document on Defendants via U.S. mail, addressed as follows:

Avilez & Sons Harvesting, LLC
C/O Alvino Avilez Castaneda, Registered Agent
174 Cousin Fannie Rd.
Faison, NC 28341-8526

Alvino Avilez Castaneda, d/b/a Alvino Avilez Contractor
PO Box 463
Faison, NC 28341-0463

The foregoing document was served via email on Counsel for Defendant Jackson's Farming Company of Autryville, as follows:

Nia K. Doaks
Ndoaks@constangy.com
Bill McMahon
Bmcmahon@constangy.com
Constangy Brooke Smith & Prophete
Counsel for Jackson's Farming Company of Autryville

This the 24th day of July, 2026.

/s/ Carol L. Brooke
Carol L. Brooke